IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-1737-KLM

JENNIFER LARSEN,

      Plaintiff,

v.

CAROLYN W. COLVIN,[1] Acting Commissioner of the Social Security Administration,

      Defendant.

_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

      This matter is before the Court[2] on the **Social Security Administrative Record**
[Docket No. 14; Filed December 3, 2012], filed in support of Plaintiff's Complaint [#1]
seeking review of the decision of Defendant, the Commissioner of the Social Security
Administration ("Defendant" or "Commissioner"), denying Plaintiff's claim for disability
insurance benefits and supplemental security income. On January 28, 2013, Plaintiff filed
an Opening Brief [#19] (the "Brief"). On February 28, 2013, Defendant filed a Response
[#20]. No Reply was filed. The Court has reviewed the entire case file and the applicable
law and is sufficiently advised in the premises. For the reasons set forth below, the Court

---

      [1] Carolyn W. Colvin became Acting Commissioner of the Social Security Administration on
February 14, 2013. Therefore, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure,
Acting Commissioner Colvin is hereby substituted for Commissioner Michael J. Astrue as the
defendant in this suit. No further action need be taken to continue this suit by reason of the last
sentence of § 405(g) of the Social Security Act, 42 U.S.C. § 405(g).

      [2] The parties consented to proceed before the undersigned for all proceedings pursuant
to 28 U.S.C. § 636(c) and D.C.COLO.LCivR 72.2. *See Order* [#25].

**AFFIRMS** the decision of the Commissioner.

## I.  Background

Plaintiff filed this action on July 5, 2012, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), for judicial review of an unfavorable decision by the Commissioner with respect to Plaintiff's claim for disability insurance benefits under Title II of the Social Security Act (the "Act"), and supplemental security income under Title XVI of the Act.

Plaintiff has completed two years of college, and most recently worked for the internet company PayPal.  Tr. 28, 126, 131.[3]  Plaintiff alleges that she was terminated in 2007 due to her alleged impairments and absences, but also suggests that the company was downsizing and eliminated her position.  Tr. 125; *see also* Tr. 36.  Plaintiff initially claimed an onset of disability in June of 2007.  Tr. 96.  However, Plaintiff's attorney moved at the ALJ hearing to amend her alleged onset of disability to May 1, 2009.  Tr. 27.  Plaintiff was born in 1975 and was thirty-three years old on the amended date of the alleged onset of disability.  Tr. 98.

### A.    Medical History

Before her alleged onset of disability in 2009, Plaintiff sought and received treatment from various healthcare professionals.  Many of these treatments concerned Plaintiff's physical impairments.  For example, in 2006, Plaintiff underwent a gastric bypass operation as part of her efforts to lose weight.  Tr. 172.  She also received treatment for hypertension

---

[3]  The Court refers to the Transcript of the Administrative Proceedings, located at Docket Nos. 14, 14-1, 14-2, 14-3, 14-4, 14-5, 14-6, 14-7, and 14-8, by the sequential transcript numbers instead of the separate docket numbers.

and high cholesterol. *See, e.g.*, Tr. 264, 266, 269.[4] James Cervantes, M.D. ("Cervantes"), Plaintiff's physician before 2001, diagnosed Plaintiff with depression in 2006 and prescribed Alprazolam.   Tr. 279.   Although Plaintiff had health insurance at this time, her treating physicians did not recommend therapy or extensive mental health treatment.   Tr. 269, 272. Although the record is unclear regarding the precise date of the prescription, Plaintiff's doctors also prescribed the anti-anxiety medication Xanax, to be used on an "as-needed" basis, as early as 2004.   Tr. 269.

When Plaintiff applied for disability, the State Disability Determination Services referred her to consultative examinations. Tr. 291.   Psychologist Richard Madsen, Ph.D. ("Madsen"), saw Plaintiff on May 1, 2009, to evaluate her claims of depression.   Tr. 286. Plaintiff alleges that she experienced difficulty sleeping, crying spells, and self-blaming, among other symptoms. Tr. 286.   Dr. Madsen noted that Plaintiff was experiencing suicidal thoughts with a history of two suicide attempts, both in her teenage years.   Tr. 287.   She said that her two previous husbands were abusive, and that although she has no children, she had experienced three miscarriages.   Tr. 287.   Dr. Madsen also noted Plaintiff's family history of bipolar disorder.   Tr. 290.

On exam, Dr. Madsen found that Plaintiff appeared "anxious, depressed, [and] somewhat hypomanic," but that she showed no signs of delusional thinking, racing thoughts, or hallucinations. Tr. 288.   Although Plaintiff appeared slightly restless and spoke excessively at times, "her speech was intelligible and did not appear to be rambling."   Tr.

---

[4] Although the Court takes note of Plaintiff's lengthy medical history surrounding her gastric bypass surgery in 2006, the Court's summary of Plaintiff's medical history focuses on Plaintiff's alleged dental impairments, as these are the main impairments at issue in Plaintiff's Brief.

288.  Plaintiff also showed slightly impaired short-term memory and an impaired ability to do arithmetic functions in her head.  Tr. 288.  However, Plaintiff showed "adequate insight into reasons for her depression and bipolar disorder," and an understanding of "commonsense [sic] solutions to everyday situations and problems."  Tr. 289.

Dr. Madsen diagnosed Plaintiff with bipolar disorder and with chronic post-traumatic stress disorder.  Tr. 289.  He also diagnosed impaired intellectual functioning and a developmental learning disorder.  Tr. 289.  He gave Plaintiff a Global Assessment of Functioning ("GAF") score of 50, indicating severe symptoms or limitations.  Tr. 289; Am. Psychiatric Ass'n, Diagnostic & Statistical Manual 34 (4th ed. text rev. 2000) ("DSM VI").[5]

Dr. Madsen explained that Plaintiff had mood swings of "mainly depression and agitation" with some rare "euphoria and grandiose thinking."  Tr. 290.  Dr. Madsen noted that Plaintiff had "a long history of depression with suicide attempts up to the age of 18," and "medical problems [were] adding to stressors . . . related to her depressive state."  Tr. 290.  Dr.

---

[5]  "The GAF is a subjective determination based on a scale of 100 to 1 of the clinician's judgment of the individual's overall level of functioning."  *Langley v. Barnhart*, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004) (citing DSM VI at 32).  The GAF scale is from 1-100.  A GAF score between 51 and 60 indicates "'moderate symptoms,' such as a flat affect, or 'moderate difficulty in social or occupational functioning."  *Wilson v. Astrue*, 602 F.3d 1136, 1142 n.3 (10th Cir. 2010) (citing DSM-IV at 34).  A GAF score between 41 and 50 indicates "[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, inability to keep a job)".  *Lee v. Barnhart*, No. 03-7025, 2004 WL 2810224, at *3 (10th Cir. Dec. 8, 2004) (quoting DSM IV 34).  The Tenth Circuit has explained it is not necessary for the Administrative Law Judge ("ALJ") to specifically mention or adopt every GAF score in her decision.  *See Luttrell v. Astrue*, 453 F. App'x 786, 791-92 (10th Cir. 2011); *Butler v. Astrue*, 412 F. App'x 144, 147 (10th Cir. 2011); *Holcomb v. Astrue*, 389 F. App'x 757, 759 (10th Cir. 2010) (holding that GAF scores taken alone do not establish an impairment serious enough to preclude an ability to work).  In addition, the Social Security Commission had declined to endorse the use of GAF scores in social security disability programs because they have no direct correlation to the severity requirements of the Listings for mental disorders.  *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury ("Revised Med. Criteria"), 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000).

Madsen concluded that Plaintiff's depression was now at a marked level, which would cause her difficulty maintaining a regular work schedule and focusing at work.  Tr. 290.  The Court also notes that when Dr. Madsen examined Plaintiff, she was not taking any medications.  Tr. 288.  Plaintiff said that she was unable to afford them, and had been without medications since 2007.  Tr. 38, 288.

Only four days after Dr. Madsen's examination, a physician's assistant at the Rocky Ford Clinic gave Plaintiff a prescription for the antidepressant Celexa.  Tr. 398.  Less than a month later, the same physician's assistant concluded that Plaintiff's depression was "uncontrolled," discontinued Plaintiff's current Celexa prescription, and prescribed Paxil.  Tr. 396.  Plaintiff next received treatment on June 24, 2009, from Vui Mai, M.D. ("Mai"), her treating physician at the time of the hearing.  Tr. 29, 392.  Dr. Mai noted that the Paxil seemed to be having no effect.  Tr. 392.  Dr. Mai also noted at this examination that although Plaintiff had recently been diagnosed with bipolar disorder, an extensive review of Plaintiff's medical records revealed neither previous mention of the disorder nor records supportive of the diagnosis.  Tr. 392.  At this time, Plaintiff had been taking Xanax as needed for five years.  Tr. 392.  Dr. Mai encouraged Plaintiff to continue to adjust to the Paxil and to slowly wean off the Xanax, replacing it with BuSpar.  Tr. 391.  Dr. Mai also observed that Plaintiff might benefit from "an antipsycotic/mood stabilizer like Abilify in the future," Tr. 391, and that Plaintiff should stop taking Paxil once Effexor became financially available.  Tr. 390.  Dr. Mai did not diagnose bipolar disorder, nor did he note any symptoms of mania.  Tr. 386.

While treating Plaintiff on September 24, 2009, Dr. Mai noted that Plaintiff's anxiety and depression seemed stable, although Dr. Mai considered putting Plaintiff on a different

combination of medications.  Tr. 381.  On April 2, 2010, Dr. Mai noted that Plaintiff's medication "seems to help quite a bit," but that Plaintiff "still [got] irritated easily, [and] her mood [was] still swinging back and forth quite a bit."  Tr. 374.

Dr. Mai's next reference to Plaintiff's depression is on July 28, 2010.  Tr. 359.  At that time, Plaintiff was taking sixty milligrams of Paxil a day, but Dr. Mai observed that "it [did] not seem like it was helpful."  Tr. 359.  Plaintiff reported that she was getting irritated very easily and sleeping very poorly, but that she was not experiencing suicidal thoughts or hallucinations.  Tr. 359.  However, Dr. Mai noted that there had been two recent deaths in Plaintiff's family.  Tr. 359.  Dr. Mai concluded that Plaintiff's depression was "suboptimally controlled" and offered to switch Plaintiff's medication from Paxil to Effexor.  Tr. 358.  As of September 20, 2010, Plaintiff still had no access to Effexor.  Tr. 355.  However, on October 26, 2010, during a routine check-up, Dr. Mai commented that Plaintiff's depression was "under control."  Tr. 348.  At the hearing, Plaintiff explained that she takes two seventy-five milligram doses of Effexor a day for her depression.  Tr. 30.  She alleges that she experiences many side effects of Effexor, including headaches, nausea, fatigue, and dry mouth.  Tr. 30.

**B.    Application to the Social Security Administration**

On February 4, 2009, Plaintiff protectively filed[6] a Title II application for a period of disability and disability insurance benefits.  Plaintiff also filed a Title XVI application for

---

[6] Protective filing is a written or oral statement that clearly establishes intent to file for Social Security Benefits. The effect of a protective filing is to preserve the date of application. For example, if a hypothetical claimant sends a letter postmarked to SSA on February 1 explaining she intends to file next month, February 1 becomes her filing date, even if she sends her application on March 27.  Program Operations Manual System, GN 00204.010C.5a-e. (SSA, June 23, 2011).

supplementary security income on February 26, 2009.  Plaintiff claimed an inability to work since her alleged onset date of May 1, 2009,[7] due to "back pain, hip pain, arthritis in both ankles, headaches [related to a Chiari malformation[8]], stomach pain, borderline diabetic, depression, [and] anxiety."  Tr. 12, 14, 96, 98, 125.

In a disability report that Plaintiff completed around the time of her application, Plaintiff reported that she was five feet, one inch tall and weighed two hundred and forty pounds.  Tr. 124.  In a second disability report, Plaintiff alleged that she was diagnosed with bipolar disorder in April of 2009.  Tr. 160.  She alleged that her various conditions began to limit her ability to work on September 1, 2001, and that she had last worked on June 1, 2006.  Tr. 125.  She alleged that her inability to sit or stand for a long period of time, shortness of breath,  severe headaches, abdominal pain, and anxiety caused her to work fewer hours and make changes to her work attendance.  Tr. 125.  With respect to her daily activities, she asserted that she performed some cleaning and household chores such as laundry, washing dishes, caring for dogs and cats, and cooking meals.  Tr. 136-39.  However, she qualified these task by noting that she works only as much as her pain allows, sometimes taking breaks to ease her pain, or preparing frozen meals when she could not cook.  Tr. 136, 139.  She also admitted to helping her boyfriend at times "on the ranch," though she alleges that her boyfriend did most of the yard work.  Tr. 137, 140.  Plaintiff later mentioned to a psychologist that she and her boyfriend cared for three horses,

[7]  Plaintiff initially claimed to be disabled in June of 2007.  Tr. 96, 125.  However, Plaintiff's attorney moved at the ALJ hearing to amend her alleged onset of disability to May 1, 2009.  Tr. 27.

[8]  "Chiari's malformation is a 'congenital anomaly in which the cerebellum and medulla oblongata, which is elongated and flattened, protrude into the spinal canal through the foramen magnum[.]'" *Trboyevich v. Astrue*, No. Civ. 07-152 , 2008 WL 398800, at *2 n.5 (D. Minn. Feb 11, 2008) (citing Dorland's Illustrated Medical Dictionary, at 1050 (29th Ed. 2000)).

-7-

but her duties in this regard are unclear. Tr. 287. Because her boyfriend was disabled, she assisted him when possible. Tr. 138. Plaintiff also read, sewed, and played computer games. Tr. 141. The record is ambiguous regarding what medications Plaintiff was taking at the alleged onset of her disability; Plaintiff represented to Dr. Madsen on May 1, 2009, that she was "not presently taking any medication" due to her financial constraints. Tr. 288. A list of medications dated January 27, 2011, indicates that Plaintiff was taking Effexor[9] three times a day for her depression, along with various medications for her physical conditions. Tr. 171.

The Commissioner denied Plaintiff's application at the initial level. Tr. 51-52. Plaintiff requested a hearing before an administrative law judge (the "ALJ") of the Social Security Administration (the "SSA"). Tr. 58. The ALJ granted Plaintiff's request and conducted a hearing on February 3, 2011. Tr. 24.

C.    The ALJ Hearing

Plaintiff and Doris Shriver, an impartial vocational expert (the "VE"), testified at the hearing. Tr. 28, 46. The ALJ first questioned Plaintiff. Tr. 35-46. Plaintiff testified that she worked at PayPal from 2002 until she was "laid off [in 2007] because of excessive absences from work due to [her] medical condition." Tr. 44. She discussed the pain and fatigue that led to her excessive absences, claiming that she "couldn't basically function."

---

[9] Although Plaintiff's account of her medications lists Effexor as treating both her depression and her bipolar disorder, Tr. 171, Dr. Mai, the prescribing physician, repeatedly references the medication as treating only Plaintiff's depression and anxiety. Tr. 354, 355, 358. *See State v. Haq*, 268 P.3d 997, 1022 (Wash. App. 2012) ("[An expert witness] was asked whether he thought Effexor was a wise choice for Haq, and he responded that, based on a 2006 study that indicated Effexor was associated with the greatest risk of mania, it was not. [The expert] described a study that attempted to answer 'the question of would antidepressants make your mental health worse if given to bipolar patients to treat bipolar depression. And of all those looked at, Effexor was by far the one most likely to cause a manic flip . . . .'").

Tr. 44.  She testified that her then doctor, Dr. Cervantes, put her on Ambien to help her sleep.  Tr. 29.  Plaintiff alleged that her current general practitioner, Dr. Mai, was treating her for multiple medical issues, including her back pain, her Chiari malformation, her 2006 gastric bypass care, headaches, and depression.  Tr. 29.  Plaintiff also testified that Dr. Mai is the only medical professional she was seeing for her depression and anxiety because she lives too far away from other options and has no medical insurance.  Tr. 30.

Regarding Plaintiff's physical capabilities, Plaintiff testified that on an average day, the longest she could stand at one time was about forty-five minutes; that she could walk about twenty-to-thirty minutes; that she could lift and carry five-to-ten pounds; and that she could not crouch or squat for long periods.  Tr. 31, 32.  She also testified that she could not sit for long periods without experiencing pain, and that she took additional Tylenol for the day of the hearing in order to sit in the car for the trip.  Tr. 32.

Regarding Plaintiff's mental and emotional condition, Plaintiff testified that she experienced severe anxiety and erratic mood swings.  Tr. 34.  She also testified that she had experienced these symptoms and taken medication to deal with the symptoms since she was a teenager.  Tr. 35.  She testified that under the care of Dr. Cervantes, she had been prescribed Effexor and Xanax and was referred for counseling prior to her 2006 gastric bypass surgery.  Tr. 37.  However, Plaintiff testified that she had no physician from September of 2007 until April of 2009, and that no one was prescribing her medications during this time.  Tr. 38.  She also explained that although she was able to work through the anxiety and depression at times, things changed when she suffered mental, physical and sexual abuse at the hands of her ex-husbands.  Tr. 42.

Regarding her daily life, Plaintiff testified that she lived with her boyfriend, and that

he owned the house and paid the bills "with the understanding that when [Plaintiff got] on disability [she would] pay him back on rent." Tr. 40.  Plaintiff alleged that aside from her boyfriend's financial assistance, she lived on food stamps. Tr. 40.  Plaintiff claimed to do the cooking in the house, while both Plaintiff and her boyfriend shared shopping duties. Tr. 41.  Plaintiff testified that only her boyfriend cared for their animals on the ranch, and she claimed to only do chores inside the house. Tr. 30, 40.  She also described playing the online, multi-player video game "World of Warcraft," but said she spent no more than an hour and a half on the computer each day. Tr. 43.  She alleged that she had driven a month ago, but that due to worsening eyesight, she no longer drove a motor vehicle. Tr. 41.

Regarding her work history, Plaintiff described her most recent employment with PayPal.  She testified that the job involved sitting for twelve hours a day working at a computer. Tr. 28.  She alleged that while there, she experienced severe back and hip pain, headaches, and swelling in her ankles. Tr. 28.  She also testified that she missed ten-to-twelve days a month due to fatigue. Tr. 29.  However, her testimony was ambiguous as to whether Plaintiff's termination was primarily due to "downsizing" or due to Plaintiff's absences. Tr. 36.

The ALJ next questioned the VE.  Tr. 46-50.  Having reviewed the record, the VE categorized Plaintiff's prior work as: 1) Cashier/checker, consisting of light work with a Specific Vocational Preparation ("SVP") of three; 2) telemarketer, consisting of sedentary work with an SVP of three; 3) shoe salesperson, consisting of light work with a SVP of four; (4) child monitor, consisting of medium work with an SVP of three; and (5) claims clerk with accompanying customer service responsibilities, consisting of sedentary work with an SVP

of four or five.  Tr. 47-48.  The VE made no averment about the transferability of Plaintiff's

skills from her past work experiences.  Tr. 67-68.

The ALJ then asked the VE about the vocational opportunities for a hypothetical

person who could perform work at a light level of exertion requiring only occasional

crouching or bending, and who had an SVP less than or equal to three due to difficulties

focusing.  Tr. 48.  The VE responded that a person with these abilities and limitations could

perform the work of a cashier/checker or telemarketer, but not the work of Plaintiff's other

past jobs.  *Id.*  The VE opined that the same would be true if the same hypothetical person

had "moderate limitations maintaining concentration, persistence and pace," but would not

be true if the individual had a "marked limitation."  *Id.* 48-49.  Plaintiff's representative did

not question the VE.  *Id.* 49.

**D.      The Commissioner's Decision**

On March 17, 2011, the ALJ issued an unfavorable decision.[10]  Tr. 9-23.  The ALJ

found that Plaintiff had not engaged in substantial gainful activity ("SGA") during the

relevant period and that she had four severe impairments: affective disorder,[11] obesity

status post gastric bypass, diabetes mellitus, and Chiari malformation with associated

headaches.  Tr. 14.   The ALJ specifically noted that Plaintiff's remaining alleged

---

[10]  For an explanation of the five-step process used by the ALJ, see Section II.A, *infra*.

[11]  "The term 'affective disorders' is defined as 'a group of mental disorders characterized by a disturbance in mood.'"  *Armijo v. Colvin*, No. 2:12-cv-330 , 2013 WL 1870590, at *3 (D. Utah May 3, 2013) (citing Stedman's Med. Dict. 27th ed. (2000) p. 525).  "The Diagnostic and Statistical Manual of Mental Disorders . . . uses the term "mood disorder" in lieu of affective disorder."  *Id.* "Mood disorders include 'the Depressive Disorders [and] the Bipolar Disorders.'"  *Id.* (citing Diagnostic and Statistical Manual of Mental Disorders IV TR (2000) p. 345).  Thus, inherently contained within the ALJ's severe impairment finding of affective disorder are both Plaintiff's alleged depression and bipolar symptoms.

impairments were not severe.  Tr. 14-15.  First, although Plaintiff alleged anxiety, the condition was noted only sporadically in Plaintiff's medical records and was apparently treated on an as needed basis.  Tr. 14-15.  This was also true of Plaintiff's hypertension, asthma, and high cholesterol.  Tr. 15.  Regarding Plaintiff's alleged back and hip pain, the medical records revealed that Plaintiff had only mild scoliosis and responded well to medication and "conservative" treatment regimes.  Tr. 15.  The ALJ also found that Plaintiff's allegations of arthritic ankles were unsupported by the medical evidence on record.[12]

The ALJ next found that Plaintiff's severe impairments, individually or in combination, did not meet or medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  In doing so, the ALJ explicitly considered Social Security Ruling 02-1p "which instructs adjudicators to consider the effects of obesity not only under the listings, but also when assessing a claim at other steps of the sequential evaluation process."  Tr. 15.

Regarding Plaintiff's residual functional capacity ("RFC") to perform work-related activities, the ALJ considered the entire record and found that Plaintiff was capable of light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with the following limitations: Plaintiff would require work with an SVP of three or less, requiring no more than occasional crouching or bending.  Tr. 16.  Finally, relying on the VE's testimony, the ALJ found that Plaintiff could perform her past work as a cashier/checker and a telemarketer.  Tr. 18.

---

[12]   The ALJ further noted that the medical history included a diagnosis of a learning disability.  Tr. 15.  However, since the medical record showed no evidence of treatment, and Plaintiff's testimony indicated relatively normal activities and functioning, this condition was considered non-severe.  Tr. 15.

Thus, the ALJ found that Plaintiff was not under a disability during the relevant period. Tr. 19.

Plaintiff appealed the ALJ's decision. Tr. 95. The Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner. Tr. 1-6. Plaintiff then timely sought judicial review of the decision by the Court. *See Compl.* [#1].

## II. Standard of Review and Applicable Law

Pursuant to the Social Security Act:

[T]he [SSA] is authorized to pay disability insurance benefits and Supplemental Security Income to persons who have a "disability." A person qualifies as disabled, and thereby eligible for such benefits, "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."

*Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003) (quoting 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B)). Under the applicable legal standard, a claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); *see also Wall v. Astrue*, 561 F.3d 1048, 1051 (10th Cir. 2009) (quoting 20 C.F.R. § 416.905(a)). The existence of a qualifying disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A).

The Court reviews a final decision by the Commissioner by examining the administrative record and determining "whether the [ALJ's] factual findings are supported by substantial evidence in the record and whether the correct legal standards were

applied." *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010). However, the Court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Harper v. Colvin*, __ F. App'x __, 2013 WL 3285617, at *1 (10th Cir. July 1, 2013) (quoting *Barnett v. Apfel*, 231 F.3d 687, 689 (10th Cir. 2000)). In other words, the Court does not reexamine the issues *de novo*. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F. 3d 739, 741 (10th Cir. 1993). Thus, even when some evidence could support contrary findings, the Court "may not displace the agency's choice between two fairly conflicting views," even if the Court may have "made a different choice had the matter been before it *de novo*." *Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007).

## A.    Legal Standard

The SSA uses a five-step framework to determine whether a claimant meets the necessary conditions to receive Social Security benefits. *See* 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden of proof at steps one through four, and if the claimant fails at any of these steps, consideration of any subsequent steps is unnecessary. *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) ("If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."). The Commissioner bears the burden of proof at step five. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

Step one requires the ALJ to determine whether a claimant is "presently engaged in substantial gainful activity." *Wall*, 561 F.3d at 1052 (quoting *Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir. 2004)). If not, the ALJ then considers, at step two, whether a claimant has "a medically severe impairment or impairments." *Id.* "An impairment is severe under the applicable regulations if it significantly limits a claimant's physical or

mental ability to perform basic work activities." *Wall*, 561 F.3d at 1052 (citing 20 C.F.R. § 404.1521).  Next, at step three, the ALJ considers whether a claimant's medically severe impairments are equivalent to a condition "listed in the appendix of the relevant disability regulation," *i.e.*, the "Listings." *Wall*, 561 F.3d at 1052 (quoting *Allen*, 357 F.3d at 1142). "If a claimant's impairments are not equivalent to a listed impairment, the ALJ must consider, at step four, whether a claimant's impairments prevent her from performing her past relevant work." *Wall*, 561 F.3d at 1052 (citing *Allen*, 357 F.3d at 1142).  "Even if a claimant is so impaired, the agency considers, at step five, whether she possesses the sufficient residual functional capability to perform other work in the national economy." *Id.*

## B.   Substantial Evidence

An ALJ must consider all evidence and explain why he or she finds a claimant not disabled. *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).  However, the ALJ need not specifically "reference everything in the administrative record." *Wilson*, 602 F.3d at 1148. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1140 (internal quotation marks omitted).  "It requires more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  A decision by the ALJ is not based on substantial evidence "if it is overwhelmed by other evidence in the record . . . ." *Grogan v. Barnhart*, 399 F.3d 1257, 1261-62 (10th Cir. 2005).  In other words, the Court's determination of whether the ALJ has supported his or her ruling with substantial evidence "must be based upon the record taken as a whole." *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). Further, evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

### III.  Analysis

Plaintiff requests judicial review of the ALJ's decision denying disability benefits and supplemental income, contending that the ALJ's decision is not based on substantial evidence.  Specifically, Plaintiff argues that the ALJ erred: (1) by failing to give full weight to Dr. Madsen's conclusion that Plaintiff was unable to work at step four; and (2) by failing to properly evaluate Plaintiff's credibility regarding her condition at step four.  *Brief* [#19] at 4.  Because the ALJ's determination of Plaintiff's credibility affects the application of the standards used in weighing medical opinions in social security cases, the Court first discusses Plaintiff's objections to the ALJ's credibility assessment before returning to the matter of Dr. Madsen's report.

### A.      Step Four: The ALJ's Assessment of Plaintiff's Credibility

Plaintiff states that the ALJ failed to conduct a proper credibility analysis because she relied too heavily on Plaintiff's daily activities and the "sporadic" nature of Plaintiff's medical treatment.  *Brief* [#19] at 15.  The Court therefore addresses whether there was substantial evidence supporting the ALJ's decision to discount Plaintiff's assertions of disability.

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence."  *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)).  "However, 'findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'"  *Hackett*, 395 F.3d at 1173 (quoting *Kepler*, 68 F.3d at 391 (brackets omitted)).  The ALJ need not make a "formalistic factor-by-factor recitation of the evidence[,]" but she must set "forth the

specific evidence [s]he relies on in evaluating the claimant's credibility." *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000); *see also Kepler*, 68 F.3d at 391 (citing *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992) (stating that the ALJ "must articulate specific reasons for questioning the claimant's credibility" where subjective pain testimony is critical); *Williams [ex rel.] Williams v. Bowen*, 859 F.2d 255, 261 (2d Cir. 1988) (stating that "failure to make credibility findings regarding . . . critical testimony fatally undermines the [Commissioner's] argument that there is substantial evidence adequate to support [her] conclusion that claimant is not under a disability")).

At the hearing, Plaintiff testified as to her difficulty with social functioning and concentration. She told the ALJ that she only interacted with one other person on a daily basis: her boyfriend and roommate, Ronald Rattie. Tr. 34-35. Plaintiff also explained that she met Ronald Rattie playing computer games and that she only played for an hour and a half each day. Tr. 42-43. Other than that, she used the computer for fifteen-to-twenty minutes at a time to check email and the news. Tr. 43. She also stated that she suffered from significant mood swings, saying "I guess the way, the only way I can explain it is that one minute I could be happy, no problems. And the next minute I could be snapping your head off. And it's really hard to monitor how I do that." Tr. 35.

The ALJ must evaluate whether a claimant's descriptions of pain and other symptoms are credible. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). When determining whether a claimant's subjective complaints of pain are credible, the ALJ should consider:

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that

> are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Branum v. Barnhart*, 385 F.3d 1268, 1273 (10th Cir. 2004) (quoting *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991)), *see Martinez v. Astrue*, No. 11-cv-02869-REB, 2013 WL 1232194, at *6 (D. Colo. Mar. 26, 2013) (applying these same factors to a credibility assessment involving claims of depression); *Purvis v. Colvin*, No. 12-2364-SAC, 2013 WL 3147642, at *6 (D. Kan. Jun. 19, 2013) (same); *Miller v. Astrue*, 496 F. App'x 853, 2012 WL 4076128, at *3-4 (10th Cir. 2012) (same).  The Court reiterates, however, that though the ALJ must set "forth the specific evidence [s]he relies on in evaluating the claimaint's credibility," she need not make a "formalistic factor-by-factor recitation of the evidence." *Qualls*, 206 F.3d at 1372.  Therefore, the Court only addresses those factors applicable to the ALJ's analysis and Plaintiff's brief.

In this case, the ALJ ultimately concluded that Plaintiff's statements concerning the "intensity, persistence and limiting effects" of her symptoms were less than credible.  Tr. 17.  The ALJ cited two reasons for discounting Plaintiff's credibility.  First, the ALJ relied on Plaintiff's limited daily activities to conclude that her testimony was not credible.  Second, the ALJ referred to Plaintiff's "sporadic" medical treatment for her affective disorder.  Plaintiff argues that neither of these reasons serves as substantial evidence to support the ALJ's credibility finding.  *Brief* [#19] at 15.  Because Plaintiff also cites to non-binding case law concerning the effectiveness of Plaintiff's medication, the Court will briefly address this factor of the ALJ's credibility determination as well.  *Id.* at 18.

### 1.    Levels of Medication and Their Effectiveness

An ALJ should consider the effectiveness of treatment in assessing credibility.  20

-18-

C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv); *White v. Barnhart*, 287 F.3d 903, 909-10 (10th Cir. 2002) (affirming that the claimant's admission that medication relieved some of her pain supported finding that her impairments were not disabling).  Here, the ALJ observed that treatment was effective in relieving Plaintiff's depression and anxiety.  Tr. 17. The medical records show that Plaintiff's own treating physician also found medications to be effective in treating her mental conditions.  Tr. 348, 381.  Plaintiff was not taking medications at the time of Dr. Madsen's examination in May 2009.  Tr. 38, 288.  However, by June 2009, a physician's assistant observed that Plaintiff was "bright" and "pleasant." Tr. 391.  The treatment record continued to show that medications were generally effective. Tr. 348, 374, 381-82, with the understandable exception of a resurgence of Plaintiff's depression after two relatives passed away.  Tr. 358-59.  Given this substantial evidence, it was reasonable for the ALJ to question Plaintiff's claims of disability.[13]

Plaintiff argues that "bipolar disorder is episodic by nature[, and that] 'any single notation that a [bipolar] patient is feeling better or has had a 'good day' does not imply that the condition has been treated.'"  *Brief* [#19] at 18 (citing *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011)).  Not only does this argument cite to non-binding authority, but Plaintiff's reasoning would require the Court to reweigh the evidence or substitute its judgment for that of the ALJ and the Commissioner, which the Court unquestionably cannot do.  *Hackett*, 395 F.3d at 1173; *White*, 287 F.3d at 905, 908, 909.  Here, the Court finds that the conclusions reached by the ALJ regarding the effectiveness of Plaintiff's treatments are

---

[13] Although Plaintiff was without medications for much of 2007, 2008, and 2009, Tr. 38, the question was whether Plaintiff was disabled after May 1, 2009, and the ALJ reasonably observed that the treatment record showed that Plaintiff's conditions responded to medication.  Tr. 17.

reasonable and consistent with the evidence.  *See Glenn v. Shalala*, 21 F.3d 983, 988 (10th Cir. 1994) (holding that the court must affirm if, considering the evidence as a whole, there is sufficient evidence which a reasonable mind might accept as adequate to support a conclusion).

### 2.     Frequency of Medical Contacts and Attempts to Obtain Relief

For the sake of clarity and concise analysis, the Court discusses the second and third factors from *Branum* together, as both factors relate to the ALJ's characterization of Plaintiff's treatment history as "sporadic."  385 F.3d at 1273.  Plaintiff argues that the ALJ improperly critiqued her relatively minimal treatment history.  *Brief* [#19] at 14, 18.  She argues that her treating sources did not suggest additional treatment such as hospitalization or even therapy, and that the ALJ improperly discounted her testimony because her treatment consisted solely of use of antidepressant medications.  *Id.* at 18.[14]

Agency regulations provide that the ALJ may evaluate the type of treatments given to a claimant.  20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv); *see also Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988) (in assessing credibility, an ALJ may consider "the extensiveness of the attempts (medical or nonmedical) to obtain relief").  Here, treating physicians relied on antidepressant and anti-anxiety medications to treat Plaintiff's depression, and treating sources also appeared to disagree with Dr. Madsen's diagnosis of bipolar disorder and instead diagnosed depression and anxiety.  *See* Tr. 386, 392.

---

[14]  Citing to the Seventh Circuit Court of Appeals, Plaintiff again argues that the nature of mental illness may prevent an individual from taking medication or submitting to treatment, and that "any single notation that a [bipolar] patient is feeling better or has had a 'good day' does not imply that the condition has been treated."  *Id.* (citing *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006);  *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011)).  For the reasons discussed in Section III.A.1., *supra*, the Court finds this argument unpersuasive.

Contrary to Plaintiff's assertions, the ALJ's consideration of these issues in this case is not legal error.  Plaintiff may offer an alternative construction of the record, but Plaintiff fails to point to any evidence suggesting that her depression is more debilitating than the ALJ found it to be.  *See Winchester v. Apfel*, No. 99-4174-RDR, 2001 WL 394893, at *2 (D. Kan. Mar. 12, 2001).  Instead, Plaintiff's arguments amount to a request that the Court reweigh the evidence and make a *de novo* assessment of credibility.  This the Court cannot do.  *See Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991) (holding that the Court must defer to the ALJ as trier of fact and individual optimally positioned to assess witness credibility).  On this evidence, the Court cannot find that it was unreasonable for the ALJ to comment that Plaintiff received only "sporadic" or "minimal" treatment.  Tr. 17.

### 3.    Daily Activities

Evidence that a claimant engages in limited daily activities does not establish that the claimant has an ability to work.  *Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988); *Hamlin v. Barnhart*, 265 F.3d 1208, 1220-21 (10th Cir. 2004).  However, this type of evidence may be considered along with other evidence in determining whether the claimant is entitled to disability benefits.  *Gossett*, 862 F.2d at 807.

The ALJ found that Plaintiff's admissions regarding her daily activities were inconsistent with her claims of disabling mental impairments.  Tr. 17.  The ALJ noted that Plaintiff performed some cleaning and household chores such as laundry, washing dishes, caring for dogs and cats, and cooking.  Tr. 17.  The ALJ also noted that Plaintiff assisted her disabled boyfriend, read, sewed, and played the computer game "World of Warcraft."  Tr. 17.  These daily activities provided a valid reason to question Plaintiff's credibility.

*Wilson*, 602 F.3d at 1146 (finding the ALJ reasonably found a claimant's description of her daily activities did not indicate disabling limitations, where, among other things, the claimant could handle finances, garden, visit friends, and go out to eat); *see Rager v. Astrue*, No. 3:11cv00310, 2012 WL 3030251, at *9 (S.D. Ohio July 25, 2012) (upholding the ALJ's finding that Plaintiff's allegations were not credible where Plaintiff was able to drive and take care of her personal needs; performed a variety of household chores, including cooking and doing laundry; took care of her dog; went shopping with her partner; and where "the record also showed that Plaintiff continues to play the computer role-playing game "World of Warcraft" for approximately 4 hours daily").

The Court finds that the ALJ appropriately utilized Plaintiff's daily activities in the evaluation of her alleged disability because the ALJ also relied on other evidence in making her overall credibility determination, such as the medical evidence and effectiveness of treatments discussed above. *See Patterson v. Apfel*, 62 F. Supp. 2d 1212, 1218 (D. Kan. 1999) (holding that an ALJ must consider and weigh multiple factors in combination when evaluating a claimant's credibility). Because the ALJ's credibility determination is supported by substantial evidence, it must be upheld. *Casias*, 933 F.2d at 801.

Based on the foregoing, the Court therefore finds that the ALJ sufficiently linked her evaluation of Plaintiff's credibility to substantial evidence in the record and that the ALJ satisfied the analysis required by *Kelper*. The ALJ offered several reasons for her conclusion and identified parts of the record evidence that indicate that Plaintiff's disability was not as severe as she asserted. The law in this Circuit "does not require a formalistic factor-by-factor recitation of the evidence. So long as the ALJ sets forth the specific evidence [s]he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are

-22-

satisfied." *Qualls*, 206 F.3d at 1372.  The Court finds that the ALJ has properly done so here.

**B.      Step Four: Standards for Weighing Medical Opinions**

Plaintiff argues that the ALJ erred by granting "little weight" to the opinion of Dr. Madsen.  *Brief* [#19] at 10 (citing Tr. 18).  Plaintiff alleges that the reasons given for this decision—that  the opinion of Dr. Madsen was based largely upon Plaintiff's self-reports of subjective complaints, and that the opinion of Dr. Madsen was inconsistent with Plaintiff's minimal treatment and functioning—fail to satisfy the requirement that the ALJ's determination be supported by substantial evidence.  *Id.*  The Court may not reweigh the evidence or substitute its judgment for that of the ALJ and the Commissioner.  *Hackett*, 395 F.3d at 1173; *White*, 287 F.3d at  905, 908, 909.  However, the conclusions reached by the ALJ must be reasonable and consistent with the evidence.  *See Glenn v. Shalala*, 21 F.3d 983, 988 (10th Cir. 1994) (the court must affirm if, considering the evidence as a whole, there is sufficient evidence which a reasonable mind might accept as adequate to support a conclusion).

An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional."  *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) (citing 20 C.F.R. § 401.1527(d)).  Treating physicians' opinions are generally given controlling weight.  *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).  However, before assigning a treating physician's opinion controlling weight, "[a]n ALJ must first consider whether the opinion is  well-supported  by  medically  acceptable  clinical  and  laboratory  diagnostic

techniques. If the answer to this question is 'no,' then the inquiry at this stage is complete."

*Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004) (quoting *Watkins*, 350 F.3d at

1300). Next, the ALJ must "confirm that the opinion is consistent with other substantial

evidence in the record. In other words, if the opinion is deficient in either of these respects,

then it is not entitled to controlling weight." *Id.* (quoting *Watkins*, 350 F.3d at 1300).

Further, "[i]t is an error to give an opinion controlling weight simply because it is the opinion

of a treating source if it is not well-supported by medically acceptable clinical and laboratory

diagnostic techniques or if it is inconsistent with the other substantial evidence in the case

record." *Watkins*, 350 F.3d at 1300 (quoting SSR 96-2p, 1996 WL 374188, at *2).

The ALJ noted that "no treating physician whose opinion would be entitled to

controlling weight rendered an opinion in this matter and in light of this, no opinion was

given controlling weight." Tr. 18. Neither party contests this finding. However, even when

a medical opinion is not given controlling weight, the inquiry does not end. *Watkins*, 350

F.3d at 1300. Such an opinion is "still entitled to deference and must be weighed using all

of the factors provided in 20 C.F.R. [§]§ 404.1527 and 416.927." *Id.* Those factors are: (1)

length of treatment relationship and frequency of examination; (2) the nature and extent of

the treatment relationship, including the treatment provided and the kind of examination or

testing performed; (3) the degree to which the physician's opinion is supported by relevant

evidence; (4) consistency between the opinion and the record as a whole; (5) whether or

not the physician is a specialist in the area upon which an opinion is rendered; and (6) other

factors brought to the ALJ's attention which tend to support or contradict the opinion. *Id.*

at 1301; 20 C.F.R. §§ 404.1527(d)(2-6), 416.927(d)(2-6); *see also Drapeau v. Massanari*,

255 F.3d 1211, 1213 (10th Cir. 2001) (citing *Goatcher v. Dep't of Health & Human Servs.*,

52 F.3d 288, 290 (10th Cir. 1995)).  Although the above factors are to be considered in

weighing medical opinions, the Court does not insist on a factor-by-factor analysis so long

as the "ALJ's decision [is] 'sufficiently specific to make clear to any subsequent reviewers

the weight the adjudicator gave to the treating source's medical opinion and the reasons

for that weight.'"  *Oldham*, 509 F.3d at 1258 (quoting *Watkins*, 350 F.3d at 1300).

After considering the factors, the ALJ must give reasons in the decision for the

weight he gives the treating source opinion.  *Watkins*, 350 F.3d at 1301.  "Finally, if the ALJ

rejects the opinion completely, he must then give 'specific, legitimate reasons' for doing so."

*Id.* (citing *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996) (quoting *Frey v. Bowen*, 816

F.2d 508, 513 (10th Cir. 1987)).   The ALJ gives three reasons that Dr. Madsen's

consultative examination was given little weight: (1) it was based largely upon Plaintiff's self

reports, (2) it was inconsistent with the functioning and minimal treatment cited elsewhere

in Plaintiff's medical history, and (3) it was "a one-time assessment rather than a

longitudinal indicator of claimant's overall functioning."  Tr. 18.

The Court first addresses the matter of Plaintiff's self-reports.  In the case of *Langley*

*v. Barnhart*, 373 F.3d 1116, 1121 (10th Cir. 2004), the Tenth Circuit Court of Appeals held:

> The ALJ also improperly rejected Dr. Hjortsvang's opinion based upon his
> own speculative conclusion that the report was based only on claimant's
> subjective complaints and was "an act of courtesy to a patient."  *Id.*  The ALJ
> had no legal nor evidentiary basis for either of these findings.  Nothing in Dr.
> Hjortsvang's reports indicates he relied only on claimant's subjective
> complaints or that his report was merely an act of courtesy.  "In choosing to
> reject the treating physician's assessment, an ALJ may not make speculative
> inferences from medical reports and may reject a treating physician's opinion
> outright only on the basis of contradictory medical evidence and *not due to*
> *his or her own credibility judgments, speculation or lay opinion.*"  *McGoffin v.*
> *Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (quotation omitted; emphasis
> in original).

Thus, the speculative dismissal of medical evidence based on an ALJ's lay opinions or assumptions about the evidence's basis would be improper.[15]  *Id.*

Plaintiff argues that psychologists necessarily rely on a claimant's description of her symptoms.  *Brief* [#19] at 6.  The Social Security Commission has also noted that "individuals with mental impairments can provide much useful information and often are the best sources of information about their impairments."  Revised Med. Criteria, 65 Fed. Reg. 50746, 50764.  The practice of psychology is necessarily dependent, at least in part, on a patient's subjective statements.  *Thomas v. Barnhart*, 147 F. App'x 755, 759-760 (10th Cir. 2005); *Miranda v. Barnhart*, 205 F. App'x 638, 641 (10th Cir. 2005).  A psychological opinion may rest either on observed signs and symptoms or on psychological tests.  *Langley v. Barnhart*, 373 F.3d 1116, 1122 (10th Cir. 2004); *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004).  The ALJ cannot reject a psychologist's opinion solely for the reason that it was based on a claimant's responses, because such rejection impermissibly substitutes the ALJ's judgment for that of the psychologist.  *Thomas*, 147 F. App'x at 760; *Miranda*, 205 F. App'x at 641.

However, the ALJ did not depend merely on her own speculation or lay opinion in deciding what weight to allot Dr. Madsen's report.  While it is true that a psychologist may rely in part on a claimant's description of her own symptoms when coming to an opinion, *see* 20 C.F.R. subpart P, app. 1, § 12.00(B),  the ALJ may give little weight to psychologists' opinions that depend on the statements of a claimant when there is reason

---

[15] The Court notes that, contrary to Plaintiff's claim, *see Brief* [#19] at 13, the ALJ did not *reject* the opinion of Dr. Madsen, but merely accorded "little weight" to it in formulating her assessment of Plaintiff's RFC.  Tr. 18.

to question the *claimant's* credibility. *See Oldham*, 509 F.3d at 1257 ("Based on the evidence indicating Ms. Oldham's propensity to exaggerate her symptoms and manipulate test results, the ALJ refused to credit opinions of treating and examining medical providers that depended on Ms. Oldham's veracity."). As the Court discussed in Section III.A., *supra*, the ALJ's assessment of Plaintiff's credibility is supported by substantial evidence, and is thus not subject to further review by this Court. Thus, the ALJ did not substitute her judgment for the medical judgment of Dr. Madsen, but applied her permissible assessment of Plaintiff's own credibility to a report which was potentially affected by Plaintiff's honesty or exaggeration.

The ALJ also found that Dr. Madsen's report was inconsistent with the functioning and minimal treatment cited elsewhere in Plaintiff's medical history. Tr. 18. Assessing a medical opinion's consistency is a relevant consideration when deciding what weigh to accord an opinion. *See Watkins*, 350 F.3d at 1301; *see also White*, 287 F.3d at 907-08 ("[W]e agree with the district court that [the ALJ] set forth specific and legitimate reasons for discounting the doctor's opinion. [The ALJ] noted first the discrepancy between Dr. Fanning's very restrictive functional assessment and her contemporaneous examination of Ms. White . . . . The ALJ also contrasted the detailed nature of examinations performed by at least one of the consulting doctors with that of Dr. Fanning."); 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 06-03p, 2006 WL 2329939, at *5.

Here, the ALJ noted Dr. Madsen's claim that Plaintiff's depression had reached a marked level, which would cause her difficulty in maintaining a regular work schedule, focusing at work, and interacting with co-workers. Tr. 17, 290. The ALJ found that Dr. Madsen's opinions were "markedly different" from the rest of Plaintiff's medical record. Tr.

17; *see* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c) (stating an ALJ must consider whether an opinion is consistent with the record as a whole).  Shortly after Dr. Madsen's examination, a physician's assistant observed that Plaintiff was "bright" and "pleasant," and that her speech was easily comprehended.  Tr. 391.  Although Plaintiff also told the physician's assistant that she was recently diagnosed with bipolar disorder, the physician's assistant commented that his extensive review of her earlier treatment records revealed no medical record supportive of such a diagnosis.  Tr. 392.  Although Dr. Cervantes diagnosed Plaintiff with depression in 2006 and prescribed Alprazolam, Tr. 279, and records from the La Junta clinic also note a history of depression, Tr. 349, these assessments did not indicate the "marked limitations" alleged in Dr. Madsen's report.  Tr. 290.  Additionally, Dr. Mai did not diagnose bipolar disorder, or find any symptoms of mania.  Tr. 386.  Therefore, the Court finds that substantial record evidence supports the ALJ's determination on inconsistency within the record.

The ALJ also considered the fact that Dr. Madsen's report was the result of "a one-time assessment rather than a longitudinal indicator of claimant's overall functioning."  Tr. 18.  Dr. Madsen was the medical consultant for the State Agency Disability Determination Services.   Tr. 286.   "In SSA nomenclature, this doctor was thus a reviewing or non-examining source."  *Gustafson v. Astrue*, No. 11-cv-00477-LTB, 2012 WL 899272, at *11 (D. Colo. Mar. 14, 2012).  The general rule is that a non-examining physician's opinion is given less weight than a treating physician's opinion.  *See id.*; *see also Martinez v. Astrue*, 422 F. App'x 719, 724 (10th Cir. 2011) ("Opinions from examining psychologists are generally entitled to less weight than those of a treating source, and the opinions of nonexamining [sic] psychologists who have never seen the claimant are generally entitled

to the least weight of all."); *Talbot v. Heckler*, 814 F.2d 1456, 1463 (10th Cir. 1987) ("The reports of reviewing physicians are also accorded less weight than those of examining physicians.").   An ALJ may also properly disregard a treating physician's functional assessment of a claimant where the treatment relationship was relatively brief.  *White*, 287 F.3d at 908; *see* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365 (6th Cir. 2013) (holding that the little weight that the ALJ gave to an opinion of a psychological therapist was sufficiently supported, where the therapist's opinion relied on claimant's subjective claims rather than on detailed clinical data, and therapist saw claimant for only five months).  In fact, the opinions of "consulting and non-treating physician[s] . . . are of suspect reliability and, if given greater weight than the opinions of the treating physician, may be grounds for reversal." *Himmelreich v. Barnhart*, 299 F. Supp. 2d 1164, 1170-71 (D. Colo. 2004) (citing *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987)).   Therefore, it was appropriate for the ALJ to consider the length and nature of Dr. Madsen's evaluative relationship with Plaintiff in deciding to accord the report "little weight."   *See* 20 C.F.R. §§ 404.1527, 416.927; *see also Bronson v. Astrue*, 530 F. Supp. 2d 1172 (D. Kan. 2008) (holding that the opinion of an examining physician who only saw social security disability claimant once is not entitled to the sort of deferential treatment accorded to treating physician's opinion).

As stated, the ALJ specified three legitimate reasons for discounting Dr. Madsen's opinion and supported this decision with citation to the evidence.  The ALJ need not "apply expressly" all the relevant factors when determining the weight of a medical opinion, *see Oldham*, 509 F.3d at 1258-5, nor must she formulaically lay out a detailed analysis of each factor, *see Qualls*, 206 F.3d at 1372.  Here, the ALJ's decision was "sufficiently specific to

make clear to any subsequent reviewers the weight [she] gave to the treating source's medical opinion and the reasons for that weight." *Watkins*, 350 F.3d at 1300 (citing SSR 96-2p).  Accordingly, Plaintiff has shown no error in the ALJ's evaluation of the medical opinions, and the Court does not accept Plaintiff's implied request to reweigh the evidence and substitute its judgment for that of the ALJ.

## IV. Conclusion

The record contains substantial evidence from which the ALJ concluded that Plaintiff was not disabled within the meaning of the Act during the time relevant to this case.  The ALJ's decision was based upon substantial evidence and is free of reversible legal error. Accordingly,

IT IS HEREBY **ORDERED** that the decision of the Commissioner is **AFFIRMED**.

IT IS FURTHER **ORDERED** that each party shall bear its own costs and attorney's fees.

BY THE COURT:

Dated:  July 23, 2013

Kristen L.  Mix
United States Magistrate Judge

-30-